Filed 5/24/24  P. v. Larios CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FERNANDO LARIOS,<br><br>    Defendant and Appellant. | F086406<br><br>(Super. Ct. No. VCF031845-96)<br><br>**OPINION** |

-ooOoo-

### THE COURT\*

APPEAL from an order of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Detjen, Acting P. J., Franson, J. and Smith, J.

## INTRODUCTION

In 1998, appellant and defendant Fernando Larios (Larios) was convicted after a jury trial of second degree murder and attempted murder, with deadly weapon enhancements. He was sentenced to 11 years plus 15 years to life. In 2022, he filed a petition for resentencing pursuant to Penal Code[1] section 1172.6. The trial court found the petition stated a prima facie case and issued an order to show cause. In 2023, the court conducted the evidentiary hearing, and found beyond a reasonable doubt that Larios was the actual perpetrator of both offenses and denied the petition.

On appeal, Larios's counsel filed a brief that summarized the facts with citations to the record, raised no issues, and asked this court to independently review the record. (*People v. Delgadillo* (2022) 14 Cal.5th 216; *People v. Wende* (1979) 25 Cal.3d 436.) Larios filed a supplemental brief and raises several issues. We affirm.

## FACTS[2]

### A. Statements and Testimony of Surviving Witnesses

"The evening of September 7, 1996, was a Saturday night. Sal Moreno began the evening at the home of his friend, Michael Ramirez. The two had a few beers before leaving in Moreno's light-colored [car] to go to Cesar Medina's home where they planned to meet some girls. The three each drank a 40-ounce bottle of beer before leaving to drive down Mooney Boulevard in Visalia. Medina wore a white shirt. Ramirez was wearing a blue shirt.

---

[1]     All further statutory citations are to the Penal Code unless otherwise indicated.

[2]     The trial court conducted an evidentiary hearing on Larios's petition for resentencing and considered the entirety of the record from his jury trial.

This court has granted Larios's request to take judicial notice of the record from his direct appeal in *People v. Larios* (June 6, 2000, F032644) [nonpub. opn.] (*Larios I*). The following facts are from this court's nonpublished opinion in *Larios I*, which affirmed the judgment on direct appeal.

"As Moreno was driving southbound on Mooney, he drove alongside a green [car] with tinted windows.[3] Moreno heard people in the [green car] yelling 'stuff' at them. Moreno made a U-turn to go back home. The [green car] was following them. While he was stopped at a light, Ramirez and Medina jumped out of the car without saying a word.

"Moreno made another U-turn and drove into a gas station. Moreno saw Medina and Ramirez fighting with others. Neither Medina nor Ramirez had weapons. Moreno saw Medina throw some punches, but Ramirez was beat up and on the ground.

"[Medina] testified that the people in [the green car] said to them something like, " 'What you looking at?' " The green car began to chase Moreno's car trying to run it off the road. The green car swerved at them while they were southbound on Mooney. Moreno hit the accelerator and drove ahead trying to avoid trouble. As they were waiting to turn, Medina saw the green car parked and someone exiting the car from the passenger side and walking toward them. Medina saw a second person approaching their car as well. Medina said, " 'They are coming,' " and then he and Ramirez exited Moreno's car.

"Medina thought the person he began fighting with was a passenger in the green car, though he was not positive. Medina thought the other guy began fighting with Ramirez. The person Medina began fighting with was skinny, about 5 feet 5 inches tall, and with hair. The skinny man was holding a shiny object. Medina remembered that as he was fighting this man, at some point he was fighting someone else. It seemed to Medina that the second man came from nowhere. After the fight, Medina saw blood and his lung had collapsed. In the hospital, he saw wounds to his stomach, arms, and to his head. The wound to his head was bleeding, as were the wounds to his chest, arms, and stomach.

---

**3**     "Moreno could not remember the color or make of the car at trial. Other witnesses described the car as a green [car]." (*Larios I*, *supra*, F032644, p. 2, fn. 1.)

"The second assailant was bald, fat, and somewhat taller than Medina. Medina was fighting him with his hands. Medina thought the first man he was fighting was the one who stabbed him and that the bald man only fought with his fists, but he was not sure whether this was so or not.

"Medina went to Ramirez who was on the ground. Ramirez was tossing, turning, grabbing his head, and groaning in pain. The ambulance came within five minutes and transported Medina and Ramirez to the hospital. Medina could not remember talking to the police that evening.

"Visalia Police Department Officer Tim Willmore arrived at the [gas] station shortly after the attack. Medina was cradling Ramirez in his arms. Ramirez was unconscious. Medina and Ramirez were both bleeding profusely from their heads and necks. Willmore interviewed Medina at the hospital. Medina told Willmore that he and Ramirez were being driven south on Mooney by Emilio (Sal Moreno) in a red [car]. People in a green [car] with tinted windows began to scream, yell, throw up signs, and … give hand signals. Medina explained that they tried to leave and continued south on Mooney.

"Medina further described the events to Willmore. Moreno went into the left turn lane at Mooney and Walnut to make a U-turn, stopping behind traffic. The [green car] stopped behind them and the assailants exited their car. Medina exited the front passenger seat and confronted a heavyset Hispanic male with a shaved head. A few seconds into confrontation the heavyset man pulled out a stabbing instrument and proceeded to stab Medina in the head, chest, and neck area. The heavyset man then went to the rear of the [red car] where Ramirez was being confronted by a second heavyset man. The man stabbed Ramirez in the head and neck. Willmore described Medina's demeanor as evasive. Medina told Willmore he had blacked out and was having difficulty remembering.

4.

"On September 16, 1996, Detective Shear of the Visalia Police Department conducted his first interview with Cesar Medina. Medina told Shear he was sitting in the front seat of Moreno's car and Ramirez was sitting in the back. There was a confrontation with three Hispanic males in a green [car] … with tinted windows. Medina explained they exchanged looks and were 'mad-dogged' by the occupants of the [green car]. Medina described the driver as 20 years old, 5 feet 10 inches tall, thin, clean shaven, hair combed back, and a white shirt. The right front passenger was 19 or 20 years old, thin, with short dark hair, wearing a red three-button polo shirt and [jeans]. The third person was 5 feet 10 inches tall, close-cropped hair or a nearly clean shaven head, heavy, wearing a black shirt.

"The driver looked at Medina and asked him if he had a problem. Medina said no one in his car responded to the comment because they did not want a problem. As Moreno drove south on Mooney, the green car drove alongside with its occupants mad-dogging Medina and his friends. Moreno drove to the left turn pocket at Mooney and Walnut. Through the rearview mirror, Medina saw men exiting the green car which was behind them. Because they did not want to be seated and defenseless, Medina and Ramirez exited the car. Medina thought it was the right front passenger who began to fight with him initially while the driver fought Ramirez. The rear passenger, Larios, then exited the green car and assisted his companions.

"Medina saw a small bladed knife in the front passenger's hand and felt a stinging to his side. Ramirez was knocked down. Medina's assailant then struck Ramirez with the hand in which he was holding the knife. The right rear passenger also attempted to hit Ramirez and encouraged the driver and front passenger to hit him. Medina tried to push the assailants off Ramirez. The three assailants then went to the green [car] which made a U-turn and proceeded north on Mooney. Medina was reluctant to reveal information to Shear.

"On October 1, 1996, Shear prepared three photographic lineups and showed them to [Medina]. Medina picked Mike Hernandez as the front passenger of the green car. On a scale of 1-to-10, with 10 being most certain, Medina stated the certainty of identification of Hernandez was 7. Medina selected Jerry Gaff as the rear passenger and stated that his certainty was 8. Medina selected Fernando Larios as the driver of the green car and the person who stabbed him and Ramirez. Medina stated that his level of certainty on Larios was 10 on a 10-point scale. Shear acknowledged this account was different from Medina's original account." (*Larios I*, *supra*, F032644, pp. 2–5.)

## B. Aftermath

"Medina suffered three stab wounds to his head and spent four days in the hospital. Ramirez died on September 20, 1996. He had four traumatic wounds. Two were cut wounds on the abdomen consistent with a knife. The puncture wounds were to Ramirez's left temple and his leg and were consistent with a screwdriver. The head wound penetrated through Ramirez's skull through Ramirez's dura, a tissue which covers the brain like a tarp, and into his brain. There was a cross-pattern imprint on the dura which the pathologist thought was made by a Phillips head screwdriver. Only the wound to the temple was life threatening. The cause of Ramirez's death was cardio respiratory arrest due to increased pressure in his head from the wound to his temple." (*Larios I*, *supra*, F032644, p. 6.)

## C. Independent Eyewitness

"Buddy Babb was at the [gas] station at Mooney and Walnut just before midnight on September 7, 1996. Mooney saw a white car, followed by a green car, in the turn lane of the intersection of Mooney and Walnut. Babb immediately noticed that both cars were stopped even though the light was green. The passenger and driver's doors of the white car flung open and two males exited the car and walked toward the rear of the white car. The driver, a front-seat passenger, and two rear-seat passengers exited the

green car.  Babb saw six Hispanic males in their late teens or early twenties confronting each other.

"Babb described the driver of the green car as being tall and heavyset.  The rear passenger sitting behind the driver was smaller and 'medium bald.'  Babb did not describe the other two passengers.  The driver of the green car and the bald passenger attacked the driver of the white car who just absorbed the attack.[4]  The passenger of the white car was attacked by two others from the green car and within 10 seconds was knocked to the ground motionless.  The four men returned to the green car and drove away.  Babb did not see anyone in the fight holding a weapon." (*Larios I*, *supra*, F032644, p. 6.)

### D.  Testimony of Daniel Leon

"Daniel Leon testified that he rode to Visalia from Los Angeles in a green [car] driven by [Larios].  Larios picked up Jerry Gaff in Visalia.  Mike Hernandez was also in the car.  Leon saw Larios start the [green car] several different days with a screwdriver so Leon knew the car was stolen.  The evening of the attack, Larios was driving.  Leon was sitting in the back seat behind the front passenger.  A brown [car] drove by them.  The front passenger talked trash and laughed at them.  Larios asked them if they had a problem.  Someone in the [brown car] spit at the [green car].

"The [brown car] accelerated, turning into the left turn lane at Mooney and Walnut.  The [brown car] stopped, however, because the light was red.  Larios followed the [brown car] and shifted the [green car] into park.  Leon saw Larios reach for something under his seat and pull out a pipe and a screwdriver.  Larios handed the pipe to Gaff who threw it on the floor, saying he would use his fists.  Leon told the others he wanted 'nothing to do with this.'

---

[4]     "Babb explained that the person he described as the driver of the white car actually just exited from the driver's side of the white car. (*Larios I*, *supra*, F032644, p. 6, fn. 2.)

"Larios and Hernandez exited the [green car] at about the same time as two of the occupants in the [brown car] threw their doors open and exited their car. As he exited the car, Larios said something like, 'We're going to f[**]k them up' or 'I'm going to f[**]k them up' or 'We're going to get these guys.' Leon attempted to restrain Gaff from exiting the car. The man exiting the driver's side of the [brown car] was wearing a blue shirt. The man exiting the passenger side of the [brown car] wore a white shirt. Leon saw Hernandez hit one of the men in the jaw. This person immediately fell down.

"Leon told Shear that the man in the blue shirt (Ramirez) and the man in the white shirt (Medina) attacked Hernandez. Larios pulled off the man in the white shirt. At first, Leon did not see Larios stab anyone with a screwdriver. As the fight progressed, Leon saw Larios jab at the rib cage of the man in the white shirt in a poking motion and then blood appeared on that victim's white shirt.

"Hernandez told Leon later that he punched the man in the white shirt with one hand and held a screwdriver in the other hand. Hernandez later claimed he hit the man in the blue shirt in the head with a screwdriver. Larios claimed he stabbed the man in the white shirt in the head with a screwdriver. Gaff exited the car and gave the man in the white shirt body blows with his fists. Larios kicked the man in the blue shirt in the head. Leon thought Hernandez might have had a screwdriver, but he was not sure.

"Larios told Leon that they did not want to get caught and attempted to hide the [green car] at his mother's house. Larios told his brother they had been in a fight on Mooney, he had stabbed someone, and he was unsure whether the person he stabbed was dead." (*Larios I*, *supra*, F032644, pp. 7–8.)

### E. Larios's Admissions

"Celestina Sosa met Larios in November 1995 and saw him sporadically as friends, not as girlfriend and boyfriend. A week or so after the stabbing, Larios came by to see Sosa at work after paging her. Sosa remembered it was just before the county fair.

"Sosa sat in Larios's [green car] talking. Larios asked her to guess what he had done. Larios told her he was cruising Mooney in his car with his friends and people in a car next to him were dogging him with dirty looks. Larios told Sosa he tried to ignore these people. The two cars stopped at a [convenience store] and Larios asked the others what was up and whether there was a problem. They replied there was not a problem and got back into their car. Driving south on Mooney, however, both groups dogged each other.

"At Tulare and Walnut, Larios and two passengers exited the car and fought two men from the other car. Larios told Sosa he had an ice pick from a friend and stabbed one of the men in the head and the leg. Sosa described Larios's demeanor as arrogant. Larios asked Sosa if she wanted to see the ice pick and reached under the seat of his car. Sosa told Larios she did not want to talk about it anymore. A few days after Sosa spoke with Larios, she heard about the stabbing in the media.

"On September 20, 1996, Carla Nunez, who was then 16, skipped school. She was picked up by Larios, who took her to [an amusement park], and had sex with him. The following day, Larios dropped Nunez off at a cousin's home and treated her poorly. [Leon] had been her boyfriend, but Nunez and Leon broke up after her relationship with Larios.

"Nunez initially testified she received a call from [Shear] concerning the fight in Visalia. She knew about the fight, but claimed she had not heard about it from Larios. Nunez claimed she did not remember what she told [Shear] other than the fact that Larios was driving a green car with tinted windows and that he was with Mike Hernandez, Jerry Gaff, and Danny Leon.

"Nunez said she probably told an investigator that Larios told her he stabbed someone, but that she did so out of anger. Nunez claimed Larios told her no details about a fight. Nunez explained that she was trying to get Larios in trouble and it was not true that Larios claimed he killed a guy.

9.

"[Shear] called Nunez on September 24, 1996, and taped their conversation. Nunez said she had known Larios for about a month. Nunez told Shear that [Leon], her boyfriend, briefly told her about the fight. She later talked to Larios who told her he had stabbed a guy and learned later that he was dead. Nunez described Larios's car as [a green car] with tinted windows. Two weeks earlier, another guy 'mad-dogged' Larios. Larios was with [Hernandez], [Gaff], and [Leon]. Nunez claimed Larios raped her on a Friday night and told her of the incident about two days later.

"Shear told Nunez to be as honest with him as she could. Nunez told Shear [that] Larios told her the streets were " 'lonely' " and he got out of his car as they got out of their car and Larios started stabbing them. Larios told Nunez that [Gaff] and [Hernandez] got out of the car and beat up the others but did not stab them. Larios said '[Gaff] and [Hernandez] think that—that they are the ones that killed him, but it was really me.' " (*Larios I*, *supra*, F032644, pp. 8–9.)

## PROCEDURAL BACKGROUND

On November 2, 1998, an amended information was filed in the Superior Court of Tulare County charging Larios with count 1, murder of Ramirez (§ 187, subd. (a)); count 2, attempted murder of Medina (§§ 664/187, subd. (a)); and count 3, assault with a deadly weapon, a screwdriver, and by means of force likely to produce great bodily injury on Medina (§ 245, subd. (a)(1)).

As to counts 1 and 2, it was alleged he personally used a deadly or dangerous weapon, a screwdriver (§ 12022, subd. (b)); and as to count 3, that he personally inflicted great bodily injury (§ 12022.7, subd. (a)).

On November 9, 1998, after a jury trial, Larios was found not guilty of count 1, first degree murder, and convicted of the lesser offense of second degree murder of Ramirez; and convicted of count 2, attempted murder of Medina, with the deadly weapon enhancements found true. The jury did not return a verdict on count 3, which was an alternative charge to count 2.

10.

On January 22, 1999, Larios was sentenced to the upper term of nine years for count 2, attempted murder, plus one year for the deadly weapon enhancement; and a consecutive term of 15 years to life for count 1, second degree murder, plus one year for the deadly weapon enhancement.

## Direct Appeal

In his direct appeal, Larios argued there was insufficient evidence he committed second degree murder and attempted murder. Larios further argued that his admissions alone could not support his conviction for second degree murder because the admissions did not satisfy the corpus delicti rule. In 2000, this court filed the nonpublished opinion that rejected his arguments and affirmed the judgment. (*Larios I*, *supra*, F032644, pp. 9–12.)

## PETITION FOR RESENTENCING

On May 27, 2022, Larios filed, in propria persona, a section 1172.6 petition for resentencing and requested appointment of counsel. He filed a supporting declaration consisting of a preprinted form stating that he was eligible for resentencing because he was charged and convicted of murder and attempted murder, and he could not presently be convicted of murder or attempted murder because of changes made to sections 188 and 189. The trial court appointed the public defender.

The prosecution filed an opposition and argued Larios was ineligible for resentencing because he was the actual perpetrator of both offenses.

## Prima Facie Finding and Further Briefing

On September 21, 2022, the trial court found Larios's petition stated a prima facie case for relief because the jury was instructed on the natural and probable consequences doctrine. The court issued an order to show cause and set an evidentiary hearing.

On November 17, 2022, the public defender's office declared a conflict, and the trial court appointed conflict counsel to represent Larios.

11.

On March 7, 2023, the prosecution filed a brief for the evidentiary hearing, and summarized the facts of the case. The prosecution argued there was overwhelming evidence that Larios was the actual perpetrator of the murder and attempted murder, he stabbed both victims, and his petition should be denied. The trial court indicated it would review the transcripts. Larios filed an objection to the court's consideration of the preliminary hearing and any other transcripts or documents, and argued Shear's trial testimony was inadmissible hearsay.

## THE EVIDENTIARY HEARING

On May 5, 2023, the trial court held the evidentiary hearing. The court stated it had reviewed the trial transcript, and portions of the preliminary hearing transcript that were admissible. Larios's attorney made several objections to certain evidence, and the parties argued whether such objections could be raised at the evidentiary hearing. After hearing the parties' arguments, the court took the matter under submission and said it would consider the defense objections. Thereafter, the prosecution filed a supplemental brief to address Larios's objections to certain evidence.

### The Trial Court's Ruling

On May 19, 2023, the trial court filed its order that denied Larios's petition for resentencing. The court stated it had reviewed the trial transcript and considered the parties' arguments, and denied Larios's petition because the admissible evidence established beyond a reasonable doubt that Larios was the actual perpetrator and acted with the intent to kill both victims.

> "[T]he evidence establishes that [Larios] personally attacked both victims with a screwdriver. He repeatedly stabbed [Medina] in the torso and then stabbed [Ramirez] in the head. Given that multiple assailants were involved in the fight, and that differing descriptions were provided of the attackers, and inconsistent statements given by the witnesses, [Larios] argues that the evidence does not establish beyond a reasonable doubt that he was the killer and attempted killer. This court respectfully disagrees.

12.

"The undisputed testimony of the pathologist established that the mortal wound inflicted upon [Ramirez] was a blow to the head with an object consistent with a Phillips head screwdriver. A second wound to [Ramirez's] leg was consistent with the head wound.

"[Medina] did not identify [Larios] at trial as the stabber, but [Shear] testified that [Medina] identified [Larios] out of a photo lineup, prior to trial, as the man who stabbed him and his friend [Ramirez]."

The trial court addressed the defense's hearsay objection to Shear's testimony. The court overruled the objection and noted that such an objection was not made at Larios's jury trial. "While hearsay, the testimony was admissible under Evidence Code sections 1235 and 770. [Medina's] earlier statements to [Shear] were inconsistent with his trial testimony and he had not been excused from giving further testimony."

The trial court further found:

"Witness [Leon] testified that he saw [Larios] exit his vehicle and enter the fray with a black and yellow Phillips screwdriver in hand. He then saw [Larios] poking at the rib cage of [Medina], after which blood appeared upon [Medina's] white shirt. Then [Leon] saw [Larios] attack [Ramirez]. He did not claim to see [Larios] stab [Ramirez] in the head, but did see [Larios] return to his vehicle with the screwdriver. After the attack, [Leon] heard [Larios] tell [Larios's] brother that he had just stabbed someone in the head.

"[Nunez] independently told police that [Larios] admitted to her that he was responsible for stabbing and killing the victim.

"[Sosa] also testified that [Larios] admitted to getting into a fight on Mooney B[oulevard], and stabbing a man in the head and leg with an ice pick. [Larios] even offered to show [Sosa] the weapon.

"This court finds [Leon's] testimony compelling, and it is strongly bolstered by [Larios's] own admissions to [Nunez] and [Sosa]. The evidence establishes beyond a reasonable doubt that [Larios] personally acted with malice in the killing of [Ramirez] and the attempted killing of [Medina]."

On June 9, 2023, Larios filed a timely notice of appeal from the trial court's denial of his petition for resentencing.[5]

## DISCUSSION

As noted above, Larios's counsel has filed a brief with this court pursuant to *Delgadillo* and *Wende*. The brief also includes counsel's declaration indicating that appellant was advised he could file his own brief with this court. By letter on January 31, 2024, we invited Larios to submit additional briefing.

Larios filed a letter brief and states he had the transcript from the evidentiary hearing, but he did not know why the trial court denied his petition for resentencing. Larios argues his petition should have been granted because the information charged him with murder and allowed the prosecution to proceed under the felony-murder rule or the natural and probable consequences doctrine. Larios further argues he was convicted of second degree murder under the natural and probable consequences doctrine, he was not a major participant who acted with reckless indifference, and he should have been resentenced.

### A. The Prima Facie Finding

"Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) [(Senate Bill 1437)] amended the felony-murder rule by adding section 189, subdivision (e). [Citation.] It provides that a participant in the qualifying felony is liable for felony murder only if the person: (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life. [Citation.] The Legislature also amended the natural and probable consequences doctrine by adding

---

[5] In addition to the section 1172.6 petition, Larios's counsel separately filed a motion for a youthful offender hearing pursuant to section 1203.1 and *People v. Franklin* (2016) 63 Cal.4th 261. After denying the resentencing petition, the trial court granted Larios's motion for a *Franklin* hearing and placed the matter on calendar.

subdivision (a)(3) to section 188, which states that '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' " (*People v. Harden* (2022) 81 Cal.App.5th 45, 50–51 (*Harden*); *People v. Strong* (2022) 13 Cal.5th 698, 707–708.)

"Senate Bill 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended," initially codified in former section 1170.95. (*People v. Strong*, *supra*, 13 Cal.5th at p. 708; *People v. Lewis* (2021) 11 Cal.5th 952, 959.) The initial version of former section 1170.95 permitted "a person with an existing conviction for felony murder or murder under the natural and probable consequences doctrine to petition the sentencing court to have the murder conviction vacated and to be resentenced on any remaining counts if he or she could not have been convicted of murder as a result of the other legislative changes implemented by [Senate Bill 1437]." (*People v. Flores* (2020) 44 Cal.App.5th 985, 992.)

Effective January 1, 2022, Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775) made substantive amendments to former section 1170.95. (Stats. 2021, ch. 551, § 2; *People v. Birdsall* (2022) 77 Cal.App.5th 859, 865, fn. 18; *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388.) On June 30, 2022, the statute was renumbered as section 1172.6 without further substantive changes. (Stats. 2022, ch. 58, § 10; *People v. Saibu* (2022) 81 Cal.App.5th 709, 715, fn. 3.) Senate Bill 775 clarified that a person convicted of "attempted murder under the natural and probable consequences doctrine" was also eligible to file a petition for resentencing, where the petitioner "could not presently be convicted of murder or attempted murder because of changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a).)

"After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause." (§ 1172.6, subd. (c).)

15.

**B. The Evidentiary Hearing**

"Once a petitioner establishes a prima facie case for relief and the superior court issues an order to show cause, the matter proceeds to an evidentiary hearing at which it is the prosecution's burden to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing. [Citations.] If the superior court finds beyond a reasonable doubt that the petitioner is guilty of murder [or attempted murder] notwithstanding the amendments to sections 188 and 189, the petitioner is ineligible for relief under section 1172.6." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951 (*Vargas*).)

"At the hearing to determine whether the petitioner is entitled to relief …, [t]he admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of [s]ection 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).)

At the evidentiary hearing, the trial court may make factual findings and credibility determinations, and weigh evidence. (*Harden*, *supra*, 81 Cal.App.5th at p. 51.) "Although the parties may offer new or additional evidence to meet their respective burdens, section 1172.6, subdivision (d)(3) does not contemplate a whole new trial on all the elements of murder. [Citation.] Rather, '[t]he retroactive relief provided by [section 1172.6] is a legislative "act of lenity" intended to give defendants serving otherwise final sentences the benefit of ameliorative changes to applicable criminal laws and does not result in a new trial or increased punishment.' [Citations.] Thus, the focus at the evidentiary hearing phase of a[ section] 1172.6 petition is 'on evidence made

16.

relevant by the amendments to the substantive definition of murder,' which, in the context of section 188, requires 'the prosecution to prove that all principals to a murder [or attempted murder] acted with malice aforethought.' " (*Vargas*, *supra*, 84 Cal.App.5th at p. 952.)

"While the superior court acts as an independent fact finder in determining whether the People have met their burden, on appeal, the reviewing court applies the substantial evidence standard to the superior court's findings. [Citation.] Under this familiar standard, ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citations.] Substantial evidence also ' "includes circumstantial evidence and any reasonable inferences drawn from that evidence." ' " (*Vargas*, *supra*, 84 Cal.App.5th at p. 951.)

"In conducting our substantial evidence review, we begin with the presumption that the evidence was sufficient to support the trial court's ruling. 'Before setting aside the judgment of the trial court for insufficiency of the evidence, it must clearly appear that there was no hypothesis whatever upon which there was substantial evidence to support the verdict.' " (*Vargas*, *supra*, 84 Cal.App.5th at p. 952.) "We must accept factual inferences in favor of the trial court's ruling. [Citation.] Where [the petitioner] urges contrary and conflicting inferences, then, we must reject them." (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 591.)

To demonstrate prejudice from the denial of a section 1172.6 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his petition would not have been summarily denied without an evidentiary hearing. (*People v. Lewis*, *supra*, 11 Cal.5th at pp. 957, 974–975; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## C. Analysis

At the evidentiary hearing on Larios's petition, the prosecution submitted the matter on the trial transcript. The trial court stated it reviewed the entirety of that transcript, and found the evidence established beyond a reasonable doubt that Larios was the actual perpetrator of the murder and attempted murder and, as a result, he was still guilty of those charges after the amendments to sections 188 and 189.

Larios asserts the trial court should have granted his petition because it never found he was a "major participant" who acted with "reckless disregard." Once the court found, beyond a reasonable doubt, that Larios was the actual perpetrator of both the murder and attempted murder, it was not required to make additional findings. As the actual perpetrator, Larios was ineligible for resentencing on both counts. (*People v. Delgadillo*, *supra*, 14 Cal.5th at p. 233 [the defendant "not entitled to any relief under section 1172.6" because he "was the actual killer and the only participant in the killing"]; *People v. Garcia* (2022) 82 Cal.App.5th 956, 969–971 [affirming denial of resentencing because record of conviction "unequivocally establishes" the defendant was the sole perpetrator and actual killer]; *Harden*, *supra*, 81 Cal.App.5th at pp. 47–48, 56 [same]; *People v. Myles* (2021) 69 Cal.App.5th 688, 692–694 [affirming denial of resentencing because the defendant admitted at parole suitability hearing that she was the actual killer; the defendant therefore was " 'directly liable,' " and " 'not vicariously liable' "]; *People v. Gallo* (2020) 57 Cal.App.5th 594, 599–600 [the defendant was the actual killer].)

As demonstrated by the record, the trial court's credibility and factual findings at the evidentiary hearing are supported by substantial evidence based on exhibits that were

properly admitted. After independent review of the record, we find that no reasonably arguable factual or legal issues exist, and the court correctly denied appellant's petition for resentencing.

## DISPOSITION

The court's order of May 19, 2023, denying appellant's petition for resentencing after conducting the evidentiary hearing, is affirmed.